# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 1, 2020 Session

## JACK W. GIBBONS ET AL. V. KYLE BENNETT ET AL.

**Appeal from the Chancery Court for Knox County**
No. 186806-I        John F. Weaver, Chancellor

———————————————————

## No. E2019-02188-COA-R3-CV

———————————————————

This case involves the sale of a closely held corporation among family members and enforcement of the parties' agreement relative thereto. The trial court determined, *inter alia*, that certain assets were the personal assets of the former corporate shareholders and did not pass with the sale of the corporation. The trial court also determined that the new sole shareholder of the corporation could not recover expenditures of corporate funds that were allegedly for the former shareholders' personal use when they owned the corporation. The trial court further determined that although one of the former shareholders had violated a covenant not to compete contained in the parties' sale agreement, the plaintiffs had failed to prove that such violation was the cause of the corporation's lost profits following the sale. The plaintiffs timely appealed. Discerning no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Dudley W. Taylor, Knoxville, Tennessee, for the appellants, Jack W. Gibbons and Top Gun Customz, Inc.

Lewis S. Howard, Jr., and Erin J. Wallen, Knoxville, Tennessee, for the appellees, Kyle Bennett and Kenneth Bennett.

## OPINION

## I. Factual and Procedural Background

On January 23, 2014, the plaintiffs, Jack W. Gibbons and Top Gun Customz, Inc. ("Top Gun") (collectively, "Plaintiffs"), filed a complaint in the Knox County Chancery Court ("trial court"), naming as defendants Kyle Bennett; Rhonda Bennett; Burkhalter & Associates, P.C.; Burkhalter & Yoder, P.C.; Burkhalter & Ryan, P.C.; Ted A. Burkhalter, Jr.; Courtney J. Yoder; and Kenneth Bennett.[1]  In the complaint, Plaintiffs alleged that on November 7, 2012, Mr. Gibbons had entered into a Stock Transfer Agreement ("STA") wherein two of the defendants, Kyle and Rhonda Bennett, had agreed to sell all of their respective shares of stock in Top Gun to Mr. Gibbons.  Prior to the STA, Kyle and Rhonda Bennett were the sole owners of Top Gun.  Plaintiffs alleged that Ms. Yoder and her firm prepared the STA and represented Plaintiffs in the transaction.

Pertinent to this appeal, paragraph six of the STA provides in relevant part:

> Sellers agree that all assets purchased by or on behalf of Top Gun Customz, Inc. or used in conducting the business of Top Gun Customz, Inc., regardless of whether such assets are held, owned by, or titled in the personal name of Sellers, shall be deemed to be the assets of Top Gun Customz, Inc. and shall not be considered a personal asset or marital asset of Sellers ("Corporate Assets").  The Corporate Asset[s] shall include, without limitation, those assets identified on Exhibit A hereto.

Exhibit A to the STA lists the following ten vehicles:  (1) a 2006 Ryno; (2) a 2010 Razer; (3) a 2005 Keystone Challenger; (4) a 1967 Ford Mustang; (5) a 2004 Dodge truck; (6) a 1994 Dodge truck; (7) a 1997 Dodge truck; (8) a 1984 Toyota truck; (9) a 1965 Ford Mustang; and (10) a 2006 Dodge Viper.  Exhibit A also lists the following: several trailers; "[c]ertain real property located at 2019 Regal Drive, Alcoa, Blount County, Tennessee" ("Regal Drive Property"); "all leasehold and property interests in the real property located at 3026 North Park Boulevard, Alcoa, Blount County Tennessee"; and "[a]ll tangible personal property and commercial personal property purchased by or on behalf of Top Gun Customz, Inc. or used in conducting the business of Top Gun Customz, Inc."  In the complaint, Plaintiffs further alleged that after the sale, Kyle and Rhonda Bennett had failed to execute documents transferring various assets to Top Gun that were subject to the STA.

Paragraph four ("Hold Harmless Clause") of the STA provides:

---

[1] Inasmuch as certain parties share the same surname, we will refer to those parties by first and last name, as necessary, to avoid confusion.  No disrespect is intended.

Buyer agrees to hold harmless Sellers for all current or potential liabilities or expenses incurred by the Corporation for any and all past, current and future operations of the business. Furthermore, Buyer agrees to be responsible for the payment of all taxes owed by the Corporation incurred on or after the transfer date of this document.

Plaintiffs averred that Mr. Gibbons had paid off some $350,000 in debt, which Kyle and Rhonda Bennett and Ms. Yoder represented as belonging to Top Gun. However, Plaintiffs stated that they had learned after the debt was paid that approximately $150,000 of the debt was personal in nature.

Paragraph nine ("Noncompete Clause") of the STA provides: "Sellers agree not-to-compete against Buyer or Top Gun Customz, Inc. in the vehicle suspension system industry within a one hundred (100) mile radius of Blount County for sixty (60) months from and after date of this agreement, based upon Buyer's assumption of all liabilities and obligations of the company." In the complaint, Plaintiffs asserted that Kyle Bennett was operating a competing business, Boost Performance, within Blount County. Plaintiffs alleged that Kenneth Bennett, Kyle Bennett's father, was his partner in the competing business. Plaintiffs averred, *inter alia*, that Kyle and Rhonda Bennett had breached the STA and that Kenneth Bennett had induced such breach. Plaintiffs sought declaratory and injunctive relief in addition to an award of damages. Plaintiffs attached a copy of the STA and Exhibit A, which contains a list of assets.

On September 12, 2014, the trial court entered an order of voluntary dismissal with respect to defendants Burkhalter & Associates, P.C.; Burkhalter & Yoder, P.C.; Burkhalter & Ryan, P.C.; Ted A. Burkhalter, Jr.; and Courtney J. Yoder based upon Plaintiffs' motion for voluntary dismissal. Following various discovery motions filed by the parties, Plaintiffs filed a motion seeking to amend their complaint in April 2015, adding, *inter alia*, averments that Kyle and Kenneth Bennett had removed certain vehicles from the garage where the vehicles were stored. Plaintiffs also sought an award of damages from Kyle and Kenneth Bennett as a result of their alleged conversion of numerous assets belonging to Top Gun.

On May 6, 2015, Kyle Bennett filed an affidavit, wherein he explained that he was married to Rhonda Bennett, who is the stepdaughter of Mr. Gibbons, but that he and his wife were in the process of divorcing. Kyle Bennett further explained that when Rhonda Bennett and he separated and filed for divorce in 2012, he was the owner of a number of vehicles, including three Dodge Vipers, and various items of personal property, including tools. Kyle Bennett stated that later in 2012, without his knowledge or permission, Rhonda Bennett and Mr. Gibbons, along with Mr. Gibbons's wife and son, caused several of the vehicles to be transferred out of Kyle Bennett's name and into their names and then removed the vehicles to other locations. Kyle Bennett further stated that

Rhonda Bennett, Mr. Gibbons, and others removed various items of personalty that belonged to him without his knowledge.

With regard to the STA, Kyle Bennett indicated that the STA was negotiated by Rhonda Bennett and Mr. Gibbons, who both represented to Kyle Bennett that the only assets being transferred were those listed in Exhibit A to the STA. Kyle Bennett further stated that in October 2013, the presiding judge in his divorce action entered an order requiring Rhonda Bennett to return his personal property to him and to provide an accounting of all marital property taken by her. According to Kyle Bennett's affidavit, he had filed a previous lawsuit in January 2013 against Mr. Gibbons, Rhonda Bennett, Troy Bull (Mr. Gibbons's son), and Jeff Browning (an employee of Top Gun who was later dismissed from the lawsuit). Kyle Bennett explained that he had alleged in the earlier action, *inter alia*, that the named defendants committed conversion and trespass to chattels concerning certain vehicles that were not listed in Exhibit A to the STA: a 1997 Dodge Viper, a 1993 Dodge Viper, a 2005 Ford Excursion, a 1998 Toyota Supra, a 2006 Chevrolet Corvette, and a 1996 Dodge Ram (collectively, "the contested vehicles"). Kyle Bennett also stated that in May 2013, the trial court entered an agreed order signed by all parties to the previous lawsuit ruling that all of the contested vehicles were the marital property of Kyle and Rhonda Bennett and should be returned to their marital estate.

The parties concede that this action was consolidated with Kyle Bennett's previously filed lawsuit in May 2015. Although the appellate record does not contain an order of consolidation, later orders reflect such consolidation in the captions of the pleadings. On June 8, 2015, Kyle and Kenneth Bennett filed an answer to the amended complaint along with a counterclaim against Mr. Gibbons, a cross-claim against Rhonda Bennett, and a third-party complaint against Mr. Gibbons's wife and Mr. Bull.

During the summer of 2015, the trial court conducted evidentiary hearings spanning four non-consecutive days concerning the rights of ownership to the contested vehicles. The court delineated the three issues to be considered during the hearings as follows:

1. Whether Kyle Bennett signed and/or otherwise authorized the filing of tax returns for Top Gun, which return or returns claimed depreciation deductions for any of the contested vehicles.

2. Whether Kyle Bennett and/or Rhonda Bennett accepted payment from Top Gun for storage of the contested vehicles at the garage adjacent to their residence in Friendsville, Tennessee; and

3. Whether the contested vehicles were deemed to be the property of Top Gun under the STA.

On October 9, 2015, the trial court entered an order on the evidentiary hearings, accompanied by a memorandum opinion, finding as follows in pertinent part:

> After hearing testimony of witnesses, including Kyle Bennett, Rhonda Cox (formerly Rhonda Bennett), and Jack Gibbons, the Court issued its Memorandum Opinion, a copy of which is attached hereto as Exhibit A and incorporated herein by reference. As more fully set forth in the Memorandum Opinion, the Court found the first issue in favor of Mr. Gibbons and Top Gun as to the 1993 Dodge Viper, 1994 Toyota Supra, and 2006 Corvette, the Court found the second issue in favor of Mr. Gibbons and Top Gun, and the Court found the third issue in favor of Kyle Bennett and Kenneth Bennett.

Following a hearing on a motion filed by Plaintiffs seeking to temporarily enjoin Kyle Bennett from competing against Top Gun, the trial court entered an order on April 6, 2016, finding that Plaintiffs had established by clear and convincing evidence their right to a temporary injunction. The court therefore enjoined Kyle Bennett from competing against Top Gun in the vehicle suspension system industry within a 100-mile radius of Blount County, Tennessee, for sixty months, retroactive to November 7, 2012. On June 30, 2016, the court denied a motion filed by Kyle Bennett to dissolve the temporary injunction.

On July 5, 2016, Kyle and Kenneth Bennett filed a motion to exclude evidence regarding financial damages, asserting that although they had served Plaintiffs with discovery requests concerning calculation and itemization of damages that Plaintiffs had alleged in the amended complaint, the requests were returned with vague information or no information at all. On July 27, 2016, Kyle and Kenneth Bennett also filed a motion *in limine* regarding damages, requesting that Plaintiffs be prevented from entering evidence regarding financial damages in part because of their lack of complete discovery responses and in part because of Top Gun's status as a "Subchapter S Corporation." Concerning these motions, the trial court entered an order on August 11, 2016, requiring Plaintiffs to respond to Kyle and Kenneth Bennett's discovery requests by August 5, 2016. The court further ordered: "To the extent any information is not provided regarding damages, such information shall be precluded from being presented at the trial of this case[.]" In this order, the court also reserved ruling on Kyle and Kenneth Bennett's motion *in limine* regarding damages and affirmed the finality of its prior ruling of September 15, 2015, concerning ownership of the contested vehicles.

Over the next several months, the trial court granted several continuances, and the parties filed a plethora of motions, ranging from discovery motions to motions seeking deadline extensions, none of which are particularly relevant to the issues on appeal. On May 5, 2017, Kenneth Bennett filed a motion for summary judgment along with a

statement of undisputed material facts. Plaintiffs filed a response in opposition. On July 20, 2017, the trial court entered an agreed order granting summary judgment to Ms. Gibbons. Subsequently, on August 14, 2017, the trial court entered an agreed order finding Kyle Bennett in civil contempt of the previously entered temporary injunction. On November 9, 2017, the trial court issued a memorandum opinion denying Kenneth Bennett's motion for summary judgment.

On December 7, 2017, Rhonda Bennett, now Rhonda Cox (hereinafter, "Ms. Cox"), filed a motion *in limine* to exclude the testimony of Jeff Browning as to the financial condition of Top Gun when he was employed there. Kyle and Kenneth Bennett concomitantly filed a motion *in limine* to exclude the expert testimony of Jeffrey Day, a certified public accountant, regarding any damages allegedly incurred by Plaintiffs. Relative thereto, Kyle and Kenneth Bennett averred that Plaintiffs had disclosed for the first time in September 2016 that Mr. Day planned to offer an opinion that Top Gun had lost profits in excess of two million dollars. The Bennetts asserted that because the August 5, 2016 discovery deadline had expired, the trial court should not allow Mr. Day to testify regarding these damages. Plaintiffs subsequently filed a motion seeking to modify the court's prior order, requesting that the court extend the aforementioned discovery deadline. The trial was subsequently continued after the parties agreed to a continuance during a December 11, 2017 hearing.

On June 7, 2018, Kyle Bennett filed a notice of voluntary nonsuit without prejudice as to his claims against Ms. Cox, Jack and Kathleen Gibbons, and Mr. Bull. On June 26, 2018, the bench trial commenced in this matter, spanning four non-consecutive days. Witnesses included Mr. Gibbons, Kyle Bennett, Ms. Cox, and Mr. Day, who testified both as a fact witness and an expert witness. Portions of the depositions of Kenneth Bennett and Jeff Browning were also read into the record. Following Mr. Day's testimony, the Bennetts' attorney moved for an involuntary dismissal of all claims relating to the Noncompete Clause, arguing that there was a lack of proof of causation. The trial court denied the motion.

On August 13, 2019, the trial court entered a memorandum opinion containing extensive findings of fact and an order reflecting its final judgment. In its order, the court awarded to Plaintiffs nominal damages in the amount of $50 against Kyle Bennett due to his breach of the STA's Noncompete Clause. The court dismissed all of Plaintiffs' remaining claims related to the STA, including inducement to breach, and dismissed all claims related to expenditures by Top Gun prior to the execution of the STA. The court further awarded to Top Gun the proceeds from the sale of the Regal Drive Property and dismissed any pending motions and remaining claims. The court taxed court costs equally between Plaintiffs and Kyle Bennett.

Plaintiffs subsequently filed a motion to amend or make additional findings of fact, which the trial court denied via an order entered on November 15, 2019. Plaintiffs timely appealed.

## II. Issues Presented

Plaintiffs present the following issues for this Court's review, which we have restated slightly:

1.  Whether the trial court erred by determining that certain vehicles were not assets of Top Gun pursuant to the terms of the STA.

2.  Whether the trial court erred in denying Top Gun the right to recover expenditures made by it with respect to certain personal vehicles.

3.  Whether the trial court erred by declining to consider the expert testimony of Mr. Day concerning damages sustained as a result of Kyle Bennett's breach of the Noncompete Clause.

4.  Whether the trial court erred by dismissing Plaintiffs' claim against Kenneth Bennett for inducement of breach of contract without accompanying its dismissal with findings of fact or conclusions of law.

5.  Whether the trial court erred in its allocation of court costs.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law, including questions involving interpretation of a contract, *de novo* with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

IV. Ownership of Vehicles

In their complaint, Plaintiffs asserted claims of ownership of certain vehicles by Top Gun, including the contested vehicles listed above, as well as a 2006 Lamborghini Gallardo, a 1994 Toyota Supra, a 2004 Dodge truck, a 2007 GMC Denali, a 1965 Ford Mustang, a 1967 Ford Mustang, and a 1989 Jeep Cherokee.  As Plaintiffs concede, the six contested vehicles were the subject of Kyle Bennett's first lawsuit and a May 2013 agreed order executed by all parties (except Top Gun), determining the contested vehicles to be the marital property of Kyle Bennett and Ms. Cox.  Plaintiffs contend, however, that Top Gun cannot be bound by this order because it was not a party to the order.  Plaintiffs further assert that this agreed order was "the deciding factor for the trial court, notwithstanding the language of the STA and proof introduced in the evidentiary hearings."  Following our thorough review of the record and the trial court's order, we conclude that the trial court properly determined ownership of the vehicles at issue.

In its August 13, 2019 memorandum opinion entered following the trial in this matter, the trial court expressly stated in pertinent part:

The final stages of this litigation concerned the claims of Mr. Gibbons and [Top Gun], for damages against [Kyle] Bennett and Ms. Cox, as well as the other defendants, relating to [Kyle] Bennett's breach of the noncompetition provision of the STA and relating to expenditures made by Top Gun in connection with six (6) vehicles determined not to be the property of Top Gun but the marital property of [Kyle] Bennett and Ms. Cox.  This litigation stems back to an agreed order entered into by [Kyle] Bennett, as the plaintiff, and Mr. Gibbons and Ms. Cox, as well as others, as the defendants, in case number 184469-1.  The agreed order declares the vehicles to be the marital property of [Kyle] Bennett and Ms. Cox.  Although the agreed order was entered into on May 7, 2013, after Mr. Gibbons had become the sole shareholder of Top Gun, Mr. Gibbons and Top Gun subsequently asserted in case number 186806-1 that the order was not binding upon Top Gun and was subject to relitigation.  Next, after this Court in the consolidated litigation redetermined that the six (6) vehicles were the marital property of [Kyle] Bennett and Ms. Cox, per this Court's ORDER ON EVIDENTIARY HEARING entered October 9, 2015, adopting its bench opinion announced September 14, 2015, Top Gun claimed damages for expenditures made by it relating to the vehicles.  Top Gun also claims damages from such expenditures relating to a 2006 Lamborghini Gallardo.  The expenditures were made by Top Gun while [Kyle] Bennett and Ms. Cox were its sole shareholders, directors and officers, prior to the transfer of their stock to Mr. Gibbons under the STA.  By one of their amended complaints, Mr. Gibbons and Top Gun alleged

that [Kyle] Bennett and Ms. Cox had made the expenditures for their personal benefit from the funds of Top Gun prior to the STA.

Plaintiffs posit that the trial court erred by failing to find that all of the vehicles referenced above belonged to Top Gun because they were used in connection with Top Gun's business and/or were maintained by Top Gun. As Plaintiffs point out, paragraph six of the STA provides that "all assets purchased by or on behalf of [Top Gun] or used in conducting the business of [Top Gun]" would be deemed corporate assets of Top Gun "regardless of whether such assets are held, owned by, or titled in the personal name of Sellers" and "shall not be considered a personal asset or marital asset of Sellers" (emphasis added). Plaintiffs claim that not only were the vehicles used in "conducting the business" of Top Gun, but certain of the vehicles were also maintained and improved by Top Gun and depreciated on Top Gun's income tax returns. In addition, Plaintiffs argue that Top Gun paid Kyle Bennett and Ms. Cox monthly rental payments for the use of their garage to store some the vehicles.

As such, Plaintiffs' claim is actually two-fold—first, Plaintiffs assert that the language of the STA requires that any vehicle used in "conducting the business" of Top Gun should be deemed Top Gun's property, regardless of the manner in which the vehicle was titled. Second, Plaintiffs argue that vehicles that were treated as belonging to Top Gun, in that Top Gun expended monetary sums to maintain them, should be deemed the property of Top Gun. We will address each argument in turn.

Plaintiffs contend that the language of the STA requires a finding that the vehicles previously described were assets of Top Gun because they were used in "conducting the business" of Top Gun. Concerning interpretation of a contract such as the STA herein, our Supreme Court has previously explained:

> In "resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide. 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001).
>
> A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. Once found to be ambiguous, a court applies established rules of construction to determine the parties' intent. "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a

- 9 -

question of fact" appropriate for a jury. *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981). . . .

The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973). The intent of the parties is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." 17 Am. Jur. 2d, *Contracts*, § 245, quoted in *Turner*, 503 S.W.2d at 190. If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

Nonetheless, a contractual provision may be susceptible to more than one reasonable interpretation, which renders the terms of the contract ambiguous. *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001), *cert. denied*, 534 U.S. 823, 122 S. Ct. 59, 151 L. Ed. 2d 27 (2001). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Turner*, 503 S.W.2d at 190-91. Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction.

*Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002).

Our Supreme Court has further explained: "An ambiguous provision in a contract generally will be construed against the party drafting it." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). Moreover, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Id*.

With regard to the STA herein, the trial court determined in its adopted findings that although Ms. Yoder prepared the STA at the behest of Ms. Cox, Ms. Yoder represented Plaintiffs with regard to the STA transaction.[2] The court found that none of the contested vehicles were specifically listed on Exhibit A to the STA and that none of the vehicles were corporate assets of Top Gun as of the date of the STA's execution.

---

[2] In its memorandum opinion issued on September 2, 2015, the trial court adopted certain findings proposed by both sides while stating that the facts were "largely uncontroverted."

Although the trial court did not make any specific findings concerning the ambiguity of the STA's language that "all assets purchased by or on behalf of [Top Gun] or used in conducting the business of [Top Gun]" would be considered corporate assets, the court made numerous findings concerning the parties' conduct surrounding execution of the STA and the sale of Top Gun. Insofar as the trial court considered parol evidence, including the parties' statements and conduct concerning the STA transaction, we conclude that the trial court implicitly found the phrase, "assets used in conducting the business of [Top Gun]," to be ambiguous. We agree, determining that the language in dispute is susceptible to more than one reasonable interpretation.

As Plaintiffs suggest, the phrase, "assets used in conducting the business of [Top Gun]," could refer to any assets used in connection with the promotion of Top Gun's business even if those assets were solely featured in advertising, trade shows, or otherwise. On the other hand, this phrase could refer to those assets used in the actual production of Top Gun's products, such as tools, machinery, parts, and so on. Because the language in dispute is capable of more than one reasonable interpretation, the language is ambiguous, and the trial court properly considered parol evidence when interpreting it. *See Planter's Gin Co.*, 78 S.W.3d at 889-90; *Allstate*, 195 S.W.3d at 612.

The evidence presented in this matter demonstrated that Kyle Bennett did not intend for the disputed language to include assets that were used solely for advertising or promoting the business of Top Gun. Kyle Bennett testified that the contested vehicles were purchased by him and Ms. Cox with their personal funds, with some of them having been purchased before Top Gun existed. He further testified that none of the vehicles were ever titled to Top Gun. Kyle Bennett related that he often placed Top Gun stickers on his and Ms. Cox's personal vehicles and used those vehicles in advertising materials and at trade shows, as he likewise did with other individuals' personal vehicles. He explained, however, that it was not his intent for any of the vehicles in dispute to be considered assets of Top Gun. He further stated in an affidavit his understanding that the only assets that would transfer with the sale of the business were those specifically listed on Exhibit A to the STA.

As previously explained, the trial court found and Mr. Gibbons acknowledged that Ms. Yoder drafted the STA and represented Plaintiffs with regard to the STA transaction. Mr. Gibbons also acknowledged that he did not consider the disputed vehicles to be assets of Top Gun at the time the STA was executed. Rather, he adopted that view after a subsequent consultation with legal counsel who had reviewed the STA's language following its execution. Mr. Gibbons had, in the months leading up to the STA's execution, treated several of the vehicles as Kyle Bennett's and Ms. Cox's marital assets by helping Ms. Cox prevent her then-husband from taking those assets or disposing of them during the divorce proceedings. Mr. Gibbons admitted that he allowed Ms. Cox to title some of the vehicles in his name and store them on his property during her divorce proceedings, and he testified that this was done to preserve them as marital assets. Mr.

Gibbons indicated that he was only keeping the vehicles for Ms. Cox and that he "never touched them." Moreover, he testified that when he undertook these actions, he believed the vehicles to be marital assets of Kyle Bennett and Ms. Cox.

Mr. Gibbons further acknowledged that he consented to entry of the May 2013 agreed order designating the contested vehicles as marital assets of Kyle Bennett and Ms. Cox after signing the STA and upon consultation with his then-counsel. Mr. Gibbons later signed documentation to transfer titles to the vehicles back to Kyle Bennett and Ms. Cox. Likewise, Ms. Cox, the other party to the STA, testified that she considered those vehicles to be marital assets at that time rather than assets of Top Gun. Ms. Cox admitted that the vehicles were bought with personal funds and were not titled to Top Gun. She further explained that she asked her parents and brother to "hold" the contested vehicles "in trust" as marital assets pending her divorce so that they would not "walk off."

The trial court found in its memorandum opinion issued on September 2, 2015, *inter alia*, that in 2012, "Rhonda Cox conspired with Jack Gibbons, Kathleen Gibbons and Troy Bull to transfer the titles to [the contested vehicles] without Kyle Bennett's knowledge and to hide [the contested vehicles] from Kyle Bennett." The court also found that Mr. Gibbons testified under oath that he was "safekeeping" the vehicles on behalf of Ms. Cox during her divorce from Mr. Bennett because the vehicles were marital assets. Based on the parties' conduct and statements, the trial court determined that the contested vehicles were "not intended by any of the parties to the [STA] to be the property of Top Gun and not intended to be subject to the [STA]." In addition, the trial court specifically stated:

> [T]his Court concludes that the taking of the vehicles by the owners of the vehicles to promotional events for the corporate business of Top Gun also owned by them as its sole shareholders did not render the vehicles owned by the two individuals into assets used in conducting the business of the corporation [Top Gun].

Based on our thorough review of the evidence presented, we agree.

The parol evidence regarding the parties' conduct and statements at the time of the STA's execution clearly demonstrates that the parties did not intend for the STA's disputed language to be interpreted as including as corporate assets Kyle Bennett's and Ms. Cox's personal vehicles that were used in advertising or promoting the business of Top Gun. *See Allstate*, 195 S.W.3d at 612. At the time of the STA's execution, none of the parties to the STA believed that (1) the vehicles at issue were anything other than personal assets of Kyle Bennett and Ms. Cox or (2) their ownership was transferred to Top Gun pursuant to the STA. It was not until sometime later when Mr. Gibbons consulted with legal counsel that he first formed a belief that the vehicles at issue could be subject to the STA's provisions. As such, the parol evidence supports the

- 12 -

interpretation that the parties' intent at the time of entering into this contract was for these vehicles to remain the property of Kyle Bennett and Ms. Cox. We further note that because the STA was drafted by Mr. Gibbons's representative, the language used must be construed against Mr. Gibbons. *See id*. We therefore affirm the trial court's interpretation of the STA determining that the vehicles in dispute were not subject to the STA and were not assets of Top Gun based on the STA's provisions.

We will accordingly address Plaintiffs' second argument, which is that vehicles "treated" as belonging to Top Gun, because Top Gun expended monetary sums to maintain them, should be deemed the property of Top Gun. The findings adopted by the trial court in its September 2, 2015 memorandum opinion included that the contested vehicles were purchased by Kyle Bennett and Ms. Cox personally but that Top Gun paid for some work performed on the vehicles. The court found that the vehicles were not registered to Top Gun and that the insurance policies were maintained in the names of Kyle Bennett and/or Ms. Cox, although Top Gun paid some of the insurance premiums on occasion and also paid registration fees on the vehicles. The court also determined that at least one of the vehicles was listed as a depreciable asset on one final Top Gun tax return, but Ms. Cox testified that this vehicle was intended for use by their son and that she did not consider it a Top Gun asset.

Concerning rent, the trial court found that the vehicles were stored in a detached garage next to the former marital residence of Kyle Bennett and Ms. Cox, which garage also contained an office space utilized by Top Gun. The court additionally found that Top Gun paid rent to Kyle Bennett and Ms. Cox for use of the garage and also stored tools and other items there.

Despite the expenditure of funds by Top Gun with regard to certain vehicles personally owned by Kyle Bennett and Ms. Cox, the trial court ultimately concluded that these vehicles were not assets of Top Gun. We agree. Plaintiffs have provided no authority for their contention that the expenditure of corporate funds by the sole shareholders of a corporation on those shareholders' personal assets would convert those assets to corporate ownership. Although such commingling of corporate and personal assets could constitute a questionable business practice, Plaintiffs have cited no authority for the proposition that such action would automatically result in a change of asset ownership. We therefore determine this argument to be unavailing.

In support of their ownership contentions, Plaintiffs argue that the trial court determined the issue of the contested vehicles' ownership based solely on the agreed order previously entered in Kyle Bennett's related action. As the trial court elucidated in its September 2, 2015 memorandum opinion, Mr. Bennett had filed a previous lawsuit against Mr. Gibbons and other defendants, asserting ownership of the contested vehicles. The court noted that Mr. Gibbons was represented by counsel in that action. As the court determined, Mr. Gibbons authorized his attorney to enter into an agreed order decreeing

that the contested vehicles were the marital property of Ms. Cox and Kyle Bennett. The court further found that Mr. Gibbons was the sole shareholder, officer, and director of Top Gun at that time; that he had knowledge of the STA, having signed it a few months prior; and that he had commonality of interest with Top Gun when he entered into the agreed order.

In addition to the trial court's numerous findings previously detailed herein regarding the parties' conduct and statements concerning the STA, the court continued its findings as follows:

> The most persuasive evidence in this case as to the intent of the parties to the stock transfer agreement is their conduct.

> While the Court did not find Ms. [Cox] to be a particularly credible witness and found her to be aligned with her stepfather, Mr. Gibbons, Ms. [Cox] did testify that she earlier had wanted the Court to deem the vehicles, quote, "to be marital property to be split up the way -- however the other marital assets were split up," close quotes. She also testified that when she transferred the vehicles to her stepfather that she believed them to be marital assets.

> The Court finds and concludes that the evidence preponderates in favor of the finding and conclusion that the vehicles were marital property of Rhonda [Cox] and Kyle Bennett and not intended by any of the parties to the [STA] to be the property of Top Gun and not intended to be subject to the [STA]. The evidence as construed through the conduct of the parties to the [STA] clearly shows that all the parties to the [STA] intended for the vehicles in dispute to remain as the individual and marital property of Rhonda [Cox] and Kyle Bennett.

As demonstrated by the extensive findings detailed in the trial court's memorandum opinion, we disagree with Plaintiff's contention that the trial court "simply recited that it found [the ownership issue] in favor of Kyle [Bennett]" or that the court "essentially determined that the agreed order in the prior case was binding and overrode all factual evidence to the contrary." The trial court clearly considered the totality of the evidence presented before rendering its judgment. Having conducted a thorough review of the record and the evidence presented in this matter, we conclude that the trial court's findings were supported by the preponderance of the evidence, and we accord appropriate weight to the trial court's determinations with regard to witness credibility.

Finally, Plaintiffs assert that Top Gun should be considered a third-party beneficiary of the STA such as to enable it to enforce the STA's provisions. However, having determined that the STA's language would not require that the disputed vehicles

be considered Top Gun assets, this argument is moot. Based on the STA's language and the parol evidence presented, we determine that the parties did not intend for the vehicles at issue to be considered assets of Top Gun pursuant to the STA. We further conclude that the actions of Kyle Bennett and Ms. Cox in expending corporate funds to improve or maintain their personal vehicles would not result in a change in the ownership of those vehicles. We therefore affirm the trial court's ruling concerning the ownership of the vehicles at issue.

## V. Recovery of Corporate Funds Spent on Personal Assets

As an alternative to their ownership argument, Plaintiffs postulate that the trial court erred by declining to allow Top Gun to recover the corporate funds expended on vehicles owned personally by Kyle Bennett and Ms. Cox. As the trial court determined in its August 13, 2019 memorandum opinion, the "expenditures were made by Top Gun while Mr. Bennett and Ms. Cox were its sole shareholders, directors and officers, prior to the transfer of their stock to Mr. Gibbons under the STA." The court further found:

> The evidence establishes that Kyle Bennett and Rhonda Cox had a history of commingling personal and corporate income, expenses, assets and liabilities of themselves and Top Gun. [Plaintiffs] claim that expenditures by Top Gun, prior to the STA, relating to the vehicles previously determined by this Court to be the marital property of Kyle Bennett and Rhonda Cox, as well as the 2006 Lamborghini Gallardo, are improper and recoupable by Top Gun. If this claim were brought by Mr. Gibbons as a shareholders' derivative action, it would be subject to dismissal because Mr. Gibbons was not a shareholder at the time of the challenged expenditures. *See* Tenn. Code Ann. § 48-17-401 and Tenn. R. Civ. P. 23.06.

> Presently, Mr. Gibbons, as the sole shareholder of Top Gun, has caused it to bring its claim for expenditures made by Top Gun while [Kyle] Bennett and Ms. Cox were its sole shareholders, directors, and officers. Neither side has cited the Court to any case discussing whether a closed corporation, after the transfer of all its stock from its former sole shareholders to a new sole shareholder, can go back and sue its former sole shareholders, who were also its only directors and officers, for challenged expenditures.

> This Court is of the opinion that the absence of any such case law is significant in two ways. First, the "[c]ourts recognizing the significant conceptual differences between the closed corporation and its publicly owned counterpart, hold where no competing minority interest appears, no fraud or apparent injury to the public or creditors is present, and no clearly

prohibitory statutory language is violated, there is no valid reason for precluding the parties from reaching any arrangements concerning the management of the corporation which are agreeable to all." 18A Am. Jur. 2d, Corporations, § 629. If [Kyle] Bennett and Rhonda Cox had taken action as the sole shareholders and directors to formally authorize expenditures, as dividends or distributions to themselves, absent injury to a creditor, there could be no complaint. Since Top Gun is a closed corporation, the same criteria is applicable to such informal action. *Id.* Second, this is not a situation where a creditor is seeking to hold a sole shareholder liable for the acts or debts of the corporation injurious to the creditor. *See Id.* at § 732. Considering that [Kyle] Bennett and Ms. Cox were the sole shareholders, directors and officers, there is no way to conclude that Top Gun did not have knowledge of the expenditures and authorized or ratified them.

Plaintiffs assert that the trial court erred in its determination because "[u]nder Tennessee corporation law, a corporation and its shareholders are distinct entities." *See Cambio Health Solutions., LLC v. Reardon*, 213 S.W.3d 785, 790 (Tenn. 2006). Although we agree that a corporation and its shareholders are distinct entities, it does not logically follow that such principle would provide authority for allowing a purchasing shareholder to be able to hold a former shareholder liable for the expenditures of a closely held corporation that occurred prior to the corporation's sale. In fact, we determine that such principle would be inapposite to the claim advanced by Plaintiffs.

Our Supreme Court has previously elucidated the following with regard to a corporate shareholder's personal liability:

Ordinarily, a shareholder of a corporation is not personally liable for the acts of the corporation. *See Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) ("A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors.") (citing *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). In appropriate circumstances, however, the corporate veil may be pierced and the acts of a corporation attributed to a shareholder. *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 (Tenn. 2010). "The corporate entity generally is disregarded where it is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." 18 Am. Jur. 2d *Corporations* § 57 (2004) (footnotes omitted).

The party seeking to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to relief. *Barbour*, 112 S.W.3d at 140. In order to pierce the corporate veil, the proof must show

- 16 -

that "the separate corporate entity 'is a sham or a dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" *Trost*, 333 S.W.3d at 88 (quoting *Barbour*, 112 S.W.3d at 140). The question of whether the corporation's separate identity should be disregarded is dependent on the specific circumstances of the case and is a "'matter . . . particularly within the province of the trial court.'" *Barbour*, 112 S.W.3d at 140 (quoting *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)). When determining whether the corporate veil should be pierced, the following factors are applicable:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Trost*, 333 S.W.3d at 88 n.13 (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). No single factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the factors in deciding the issue. *Barbour*, 112 S.W.3d at 140. However, in all events, the equities must "substantially favor" the party requesting relief, *Trost*, 333 S.W.3d at 89, and the presumption of the corporation's separate identity should be set aside only "with great caution and not precipitately." *Schlater*, 833 S.W.2d at 925.

*Rogers*, 367 S.W.3d at 214-15.

In this matter, Plaintiffs have not advanced a claim seeking to pierce Top Gun's corporate veil in order to hold the individual shareholders liable for the corporation's expenditures made prior to the sale of Top Gun to Mr. Gibbons. Assuming, *arguendo*, that such a claim had been advanced, the proof presented was insufficient to hold Kyle Bennett and Ms. Cox personally liable for such corporate expenditures made while they were Top Gun's only shareholders. Plaintiffs have failed to show that the "corporate entity '[was] a sham or a dummy' or that disregarding the separate corporate entity [was] 'necessary to accomplish justice.'" *See id.* We therefore affirm the trial court's declination to disregard the corporation's separate identity in order to hold Kyle Bennett and Ms. Cox personally liable for Top Gun's corporate expenditures while they were its only shareholders.

## VI. Testimony of Expert Witness

Plaintiffs' next issue questions whether the trial court erred by "disregarding" the expert testimony of Mr. Day with regard to the damages sustained by Top Gun due to Kyle Bennett's breach of the Noncompete Clause. We note that in the argument section concerning this issue in their appellate brief, Plaintiffs first argue that the trial court erred by determining that both Mr. Gibbons and Kyle Bennett had breached the STA's provisions. However, Plaintiffs did not raise an issue in their statement of issues concerning the trial court's findings with regard to Mr. Gibbons's breach. Inasmuch as issues not raised in the statement of issues may be considered waived, we decline to address this argument and will only address the issue presented with regard to proper consideration of Mr. Day's testimony. *See Ethridge v. Estate of Ethridge*, 427 S.W.3d 389, 395 (Tenn. Ct. App. 2013) ("Issues not raised in the statement of the issues may be considered waived.").

The trial court stated as follows with regard to the proof of damages resulting from Kyle Bennett's breach of the Noncompete Clause:

[W]hile both sides breached the STA, the evidence does not sustain that Mr. Gibbons or Top Gun suffered any actual damages from the defendant Kyle Bennett's breach of the noncompetition provision. The testimony of the plaintiffs' expert and fact witness, Jeffrey Day, CPA, was the only proof proffered, at the hearing commencing June 26, 2018, on the issue of damages from defendant Kyle Bennett's breach of the noncompetition provision. Mr. Day testified that Top Gun began experiencing a diminishment in revenues immediately following Mr. Gibbons' acquisition of the company and that the decline continued on a consistent basis of $413,425.00 per month. Mr. Day testified that Top Gun lost profits in the total amount of $2,371,898.00 during the period from November 8, 2012, through July 31, 2016. At the rate of $413,425.00 per month, as testified by Mr. Day, all of the damages would have accrued in the first six months

of Mr. Gibbons' operation of the business. However, the defendant Kyle Bennett did not begin conducting his competing business until the seventh month after Mr. Gibbons' acquisition of Top Gun. Therefore, no damages could be attributable to the defendant Kyle Bennett's operation of his competing business commencing in the seventh month following Mr. Gibbons' acquisition of Top Gun.

Mr. Day's opinion of lost profits was based upon his use of a "before-and-after method" comparing the profits before Mr. Gibbons assumed ownership with those after Mr. Gibbons' ownership. However, Mr. Day was unable to attribute Mr. Gibbons' decrease in profits to anything in particular. There was no evidence as to what caused any particular customer to decrease or decline purchases. Mr. Day testified that he did not have any basis for asserting "what the cause was for the missing sales," but that he could only observe the revenue trends. Conversely, Jeffrey Browning, the former general manager of Top Gun, testified, by deposition, that Top Gun lost business because of Mr. Gibbons' bad business practices. Mr. Browning testified that Top Gun, under Mr. Gibbons' management, required more time to complete vehicles because Mr. Gibbons restricted the ordering of necessary parts, paid some of its parts vendors over a longer period of time, and failed to pay other parts vendors at all. Consequently, Top Gun's vendors would not ship necessary parts until receipt of payment, all of which delayed the completion of its vehicle suspension work.

The evidence from Mr. Gibbons and Top Gun at the hearing on their application for a temporary injunction was likewise deficient as to the basis for determining why customers of Top Gun had declined or decreased their purchases from Top Gun. The operations of Top Gun had been shut down prior to the STA. Mr. Gibbons testified about the decrease in the gross revenues of Top Gun but had no personal knowledge about transactions between Top Gun's customers or former customers and defendant Kyle Bennett or his LLC. Furthermore, Mr. Gibbons did not testify in terms of Top Gun's lost profits but only in terms of gross revenues, which would not be equivalent to actual damages. As set forth above, the testimony of the plaintiffs' expert, Mr. Day, actually demonstrates that all of the decline occurred prior to the competition. Also, the testimony of Top Gun's former general manager, Mr. Browning, indicates that the decline was due to mismanagement. In announcing its decision to grant the temporary injunction, the Court referred to the ground for injunctive relief that actual damages would be difficult to ascertain (leaving the plaintiff with no remedy other than nominal damages absent injunctive relief).

The plaintiffs have the burden of not only showing breach of the noncompetition provision but also the actual damages, "which are the natural and proximate results of the breach." *Johnson v. Jones*, 1 Tenn. App. Rpts. 24, 28 (Tenn. Ct. App. 1925). *See also Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001). This Court finds and concludes that the plaintiffs have been unable to meet their burden of proof as to any actual damages from the defendant Kyle Bennett's breach of the noncompetition provision.

Plaintiffs contend that the "only reasonable inference" to be drawn from the evidence presented was that the lost profits suffered by Top Gun were the result of Kyle Bennett's competing business. We disagree. The evidence in the record from Mr. Day and Mr. Gibbons clearly demonstrates that Top Gun experienced a significant decline in business following its sale to Mr. Gibbons and that such decline occurred immediately after the sale. However, the evidence presented fell short of demonstrating that Kyle Bennett's competition was the reason for such decline.

Mr. Gibbons acknowledged that he purchased Top Gun without performing any due diligence and having no familiarity with the vehicle suspension system industry. Furthermore, Mr. Gibbons stated that he believed Top Gun was financially successful because Ms. Cox and Kyle Bennett enjoyed a lavish lifestyle. According to the testimony of Mr. Gibbons at trial and the deposition testimony of Mr. Browning, Top Gun actually ceased operations prior to the STA's execution because there was no money to pay employees or vendors. Mr. Gibbons asserted that he then began paying off Top Gun's debts, ultimately expending over two million dollars on such payments.

Mr. Gibbons testified that following his purchase of Top Gun, the company lost the business of certain car dealers with whom Top Gun had previously done business. However, Mr. Gibbons could not say definitively whether this loss of business was the result of any competition by Kyle Bennett. Mr. Gibbons stated that Mr. Browning was untruthful in his deposition when Mr. Browning claimed that Top Gun failed to pay certain vendors after Mr. Gibbons purchased the company and thus could not acquire needed parts or complete orders in a timely fashion.

Mr. Day testified that Top Gun lost significant profits following its sale to Mr. Gibbons and that such decline occurred immediately after the sale occurred. Notably, Mr. Day could not attribute the losses to any particular cause. Mr. Day opined that he did not believe the change in ownership would have caused the decline despite Mr. Gibbons's lack of experience with Top Gun's industry or with internet sales. However, Mr. Day, having previously performed accounting work for Top Gun when it was owned by Kyle Bennett and Ms. Cox, described Kyle Bennett as "brilliant," a "shrewd businessman," and an "enthusiast" in Top Gun's industry of vehicle suspension systems.

As proof concerning Kyle Bennett's competition with Top Gun, Kenneth Bennett stated that Kyle Bennett had been working with a friend in Bristol, Tennessee, making suspension parts for "monster" and "baja" trucks when Kenneth Bennett decided to start a limited liability company physically located in Maryville, Tennessee, called, "KJB, LLC," and operating as "Boost Performance" and later "Stealth Suspensions."[3]  Kyle Bennett and Kenneth Bennett worked together in Stealth Suspensions thereafter, with Kenneth acting as chief manager and Kyle performing most of the day-to-day operations. Exhibits in the record demonstrate that the LLC was formed in July 2013, although a lessor's letter entered as an exhibit at trial references a lease having been entered into by Stealth Suspensions in June 2013.  Ergo, as the trial court found, Kyle Bennett's acknowledged competition with Top Gun in violation of the Noncompete Clause began approximately seven months after the sale of Top Gun to Mr. Gibbons in contrast to Mr. Day's testimony that Top Gun began to suffer significant losses immediately after Mr. Gibbons purchased the business.

Based on the proof presented, we agree with the trial court that Plaintiffs failed to prove actual damages resulting from the breach of the Noncompete Clause.  As this Court has previously clarified:  "Lost or expected profits are recoverable as damages if they are shown to be a consequence of the breach [of a noncompete clause], provided the amount can be proved with reasonable certainty." *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001) (emphasis added).  Additionally, "[a] plaintiff seeking lost profits bears the burden of proving the amount lost with reasonable certainty, and that the loss was a direct consequence of defendant's breach." *Hurst Co., Inc. v. Bituminous Ins. Companies*, No. 03A01-9707-CH-00304, 1998 WL 283069, at *5 (Tenn. Ct. App. May 28, 1998) (citing *Lamons v. Chamberlain*, 909 S.W.2d 795 (Tenn. Ct. App. 1993)). Moreover, "[w]hether a breach of contract was the proximate cause of lost profits is a question of fact." *See Hurst*, 1998 WL 283069, at *5.

Although Mr. Day's testimony did demonstrate that Top Gun suffered lost profits, it did not prove that those lost profits were the consequence of Kyle Bennett's breach of the Noncompete Clause.  Other facts were shown that also could have contributed to the losses, such as Mr. Gibbons's unfamiliarity with the industry, Top Gun's cash flow issues and lack of capital, and Kyle Bennett's withdrawal from the business.  Moreover, Plaintiffs failed to explain why Top Gun's losses occurred immediately following the sale despite the fact that the Bennetts' competing business in Blount County was not established for approximately seven months.  Based on the lack of causation shown, we

---

[3] We note that the Noncompete Clause specified that only competition within 100 miles of Blount County, Tennessee, would be considered a breach thereof.  No argument has been presented that work performed in Bristol would fall within the Noncompete Clause's geographic parameters.

conclude that the trial court did not err in assessing only nominal damages for Kyle Bennett's breach of the Noncompete Clause.[4]

Plaintiffs also argue that the trial court erred by ignoring evidence of Kyle Bennett's alleged fraudulent conduct, such as Mr. Browning's testimony that Kyle Bennett told him in October 2012 that he was going to run Top Gun's business "into the ground" before the STA was executed. We note, however, that Plaintiffs' attorney stipulated during the second day of trial that Plaintiffs had asserted no claims of fraud or misrepresentation by Kyle Bennett concerning the STA.

Plaintiffs further contend that Kyle Bennett violated the duty of good faith and fair dealing with respect to the STA. *See*, *e.g.*, *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 686 (Tenn. 2013) ("Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract."). Although the Bennetts posit that this claim was never mentioned until after the trial in this matter, Plaintiffs assert that the issue of good faith and fair dealing is not necessarily separate from a claim of breach of contract and does not have to be explicitly stated. Even assuming, *arguendo*, that such a claim was advanced at trial, it would not alter the fact that Kyle Bennett's breach of the Noncompete Clause was not shown to be the proximate cause of Top Gun's lost profits. We therefore find these arguments unavailing.

## VII. Inducement of Breach of Noncompete Clause

Plaintiffs also contend that the trial court erred by dismissing their claim that Kenneth Bennett induced Kyle Bennett to breach the Noncompete Clause without making appropriate findings of fact and conclusions of law. We note, however, that the trial court made the following findings and conclusions relevant to this claim:

> This Court finds and concludes that the plaintiffs have been unable to meet their burden of proof as to any actual damages from the defendant Kyle Bennett's breach of the noncompetition provision. Likewise, there is insufficient proof of any actual damages attributable to the tortious acts of defendant [Kenneth] Bennett in inducing or contributing to defendant Kyle Bennett's breach. Proof of damages is an inherent weakness in noncompetition cases often resulting in the issuance of injunctive relief as the preferable and only available remedy. *See Johnson v. Jones*, 1 Tenn. App. Rpts. 24, 28 (Tenn. Ct. App. 1925) *quoting Bradford & Carson v. Montgomery Furniture Co.*, 92 S.W. 1104, 1110 (Tenn. 1906) (*quoting* "[t]he chief difficulty found in actions for breach of contract of this character is in ascertaining the damages which the plaintiff can recover, as

---

[4] As the trial court found, the Noncompete Clause had expired by the time of trial such that a grant of injunctive relief would have been ineffective.

they are generally uncertain, remote and speculative. For this reason, the most efficient remedy is an injunction inhibiting the defendant from again entering into the business he has contracted not to resume . . ."). However, the defendant Kyle Bennett has admitted that he violated the noncompetition provision, and previously in this case, admitted that he had violated the temporary injunction issued in this case to prohibit him from violating the noncompetition provision. Since this litigation has been pending, the period of the noncompetition provision has expired rendering the injunctive relief moot. Without an award of nominal damages, the plaintiff, Jack Gibbons, will have suffered a wrong without a remedy. Accordingly, the Court will award nominal damages to the plaintiff, Jack Gibbons, from the defendant, Kyle Bennett, in the amount of $50.00. *See Johnson v. Jones*, 1 Tenn. App. Repts., at 28 (The plaintiff "must be prepared to prove such damages as the law recognizes or otherwise he can receive only nominal damages."); *see also* Tenn. Juris., Damages, § 3. All other claims for breach or inducement to breach the STA, including but not limited to its noncompetition provision, will be dismissed.

Although the majority of the trial court's findings pertain to Kyle Bennett and his breach of the Noncompete Clause, the trial court did clearly find, *inter alia*, that there was "insufficient proof of any actual damages attributable to the tortious acts of defendant [Kenneth] Bennett in inducing or contributing to defendant Kyle Bennett's breach." As the parties concede, the elements of a claim of inducement of breach of contract require proof of damages resulting from the breach much like the actual claim of breach. *See TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). Ergo, as with Plaintiffs' assertion concerning Kyle Bennett's breach of the Noncompete Clause, their claim that Kenneth Bennett induced such breach cannot be successful without evidence that the breach caused damages to Top Gun. Inasmuch as Plaintiffs failed to proffer sufficient proof, their claim of inducement to breach the Noncompete Clause must also fail. Based on our review of the record and the trial court's findings and conclusions, we affirm the trial court's ruling concerning this issue as well.

VIII. Allocation of Court Costs

Finally, Plaintiffs argue that the trial court erred in its allocation of court costs by assessing fifty percent of the court costs to Plaintiffs. Plaintiffs assert that Kyle Bennett should have borne all court costs because of his breaches of the STA and violation of the court's temporary injunction concerning non-competition. As Plaintiffs acknowledge, however, "[t]axation of court costs are normally within the sound discretion of the trial court, and [the court's] action on these issues will not be disturbed unless the record discloses a clear abuse of discretion or where such discretion is superseded by statute." *Carson Creek Vacation Resorts, Inc. v. State, Dep't of Revenue*, 865 S.W.2d 1, 3 (Tenn. 1993). Plaintiffs characterize themselves as the prevailing parties in this matter, noting

that a "successful party in all civil actions is entitled to full costs" pursuant to Tennessee Code Annotated § 20-12-101 (2009).

As our Supreme Court has explained: "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In the case at bar, Plaintiffs were only partially successful in their claims against Kyle Bennett, resulting in a judgment for the proceeds from the sale of the Regal Drive Property and nominal damages of $50. Based on our thorough review of the record, we conclude that the trial court did not abuse its discretion in its allocation of court costs.[5]

## IX.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. We remand this matter to the trial court for enforcement of the judgment and collection of costs assessed below. Costs on appeal are assessed to the appellants, Jack W. Gibbons and Top Gun Customz, Inc.

s/  Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE

---

[5] We note that in the argument section of their reply brief, Plaintiffs complain that there were unnecessary delays in this matter, resulting in the case being "strung out" at the trial court level. However, because Plaintiffs did not raise an issue in their statement of issues concerning this argument, we decline to address it. *See Ethridge*, 427 S.W.3d at 395 ("Issues not raised in the statement of the issues may be considered waived.").